**IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF VIRGINIA**

**Alexandria Division**

| | |
|---|---|
| KHIDMAT TRIDENT COMPANY,<br>*Plaintiff*,<br>v.<br>CONSTELLIS, LLC<br>*Defendant*. | Case Number: 1:26-cv-2495 |

**COMPLAINT**

Plaintiff, Khidmat Trident Company ("KTC"), files this Complaint against Defendant Constellis, LLC ("Constellis"), and in support thereof, states as follows:

**NATURE OF THE ACTION**

1. This case arises from Constellis's clandestine storage of thousands of illegal firearms, heavy weapons, and explosives at Camp Oryx, a commercial logistics and lodging facility outside Kabul, Afghanistan, and from Constellis's refusal, when the Taliban discovered those weapons in August 2021, to take any responsibility for them. The facility was seized, its personnel were detained and tortured, and the business that operated from it was destroyed.

2. Plaintiff KTC is the Afghan company that brought Constellis to Camp Oryx. In October 2018, Afghan authorities had begun scrutinizing Constellis's storage of illegal weapons at another of its facilities, Camp Integrity, and Constellis needed somewhere else to put its containers. It came to KTC. In exchange for the use of the facility, Constellis agreed in writing "to have all their assets, registered with afghan government," and to "take full responsibility of their assets" within "the framework of afghan government." It further agreed that "KTC Group

and the facility owners are not responsible for any liabilities and government endorsements in regards to CONSTELLIS activities and assets." That agreement ran "through the time the customer uses the facility," and no writing between KTC and Constellis ever amended or terminated it.

3. Constellis broke that promise at once. Its solution to the Camp Integrity problem was simply to move the weapons to Camp Oryx. Within hours of the containers arriving, Afghan law enforcement was at the gate searching for illegal weapons. Constellis's Afghanistan Country Manager and Business Development Manager assured KTC's chief executive that Constellis was no longer storing such weapons and would not do so going forward. Those assurances were false when made, and Constellis's own internal emails, weapons registers, and asset spreadsheets—which KTC first obtained in 2025—record unregistered weapons at Camp Oryx throughout the period, describe some of them as "illegal," and treat the problem as one that would "get [our] people locked up."

4. Relying on those assurances, KTC and its operating subsidiary permitted Constellis's continued use of Camp Oryx and surrendered the protections that had guarded against exactly this danger—the right to be told what hazardous equipment, expressly including firearms, was stored on the property; the right to investigate and remove anything illegal or unregistered; and the right to terminate immediately upon discovering a violation. From that point forward Constellis alone held the keys to the containers, kept them behind a secured fence, monitored them with its own cameras, and barred every Afghan employee from approaching them.

5. Then, as the United States withdrew and Constellis closed and consolidated its remaining sites, the danger escalated. On information and belief, in late July and August 2021

Constellis brought to Camp Oryx for the first time a categorically different class of material—a DShK 12.7mm heavy machine gun, 82mm mortars and mortar tubes, rocket-propelled grenades, landmines, and explosive munitions—war-caliber weapons that no private security company could lawfully possess or register in Afghanistan under any circumstances. Constellis's own records document a container delivered to Camp Oryx on August 1, 2021, two containers taken off the site at the end of July and returned on August 2, 2021, and heavy-lift crane trucks admitted to the property. Constellis visited Camp Oryx on August 10, August 11, and August 12, 2021, in the final days before the collapse.

6. When Taliban forces reached Camp Oryx days later and demanded that the containers be opened, Constellis instructed that the locks be broken without a word of warning about what was inside. The Taliban found more than 5,000 weapons, concluded the site had been a clandestine United States military base, declared it war booty, and confiscated it. Constellis could have stopped it. The Taliban sought registration papers or a representative who would account for the weapons, and a Taliban court later affirmed the seizure precisely because Camp Oryx could not "present the owner or a legal representative of Constellis." In a perfect experiment, KTC's other facilities, which held no Constellis weapons, were visited by the Taliban and left untouched.

## PARTIES

7. Plaintiff Khidmat Trident Company, also known as KTC Group ("KTC"), is a corporation organized and existing under the laws of Afghanistan, with its principal offices at the Kabul International Cargo Yard, Kabul, Afghanistan. KTC is the parent of Oryx Afghanistan ("Oryx"), the company that operated Camp Oryx. Farhan Yusefzai is, and at all relevant times was, the chief executive officer and controlling principal of both KTC and Oryx.

8. KTC is the counterparty to Contract No. GM3043 with Constellis, dated October 13, 2018 (the "2018 KTC Contract"), under which Constellis obtained the right to use the facility later known as Camp Oryx and to store its containers there.

9. Defendant Constellis, LLC is a limited liability company organized under the laws of Delaware with its principal place of business in Herndon, Virginia. Constellis is the counterparty to the 2018 KTC Contract.

## JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a)(2). KTC is a corporation organized under the laws of Afghanistan and is therefore a citizen or subject of a foreign state. Constellis is a citizen of a State, being organized under the laws of Delaware with its principal place of business in Virginia. The amount in controversy exceeds $75,000, exclusive of interest and costs.

11. This Court has personal jurisdiction over Constellis because it maintains its principal place of business in this District.

12. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) because Constellis resides in this District, and in the Alexandria Division under Local Civil Rule 3(C).

13. KTC is not a signatory to, and has never agreed to be bound by, the Vendor Services Agreements executed between Constellis entities and Oryx in 2019 and 2021, including their integration, forum-selection, limitation-of-liability, and jury-waiver provisions.

## RELATED ACTION

14. A related action is pending before this Court: *Oryx Afghanistan and Farhan Yusefzai v. Constellis, LLC, et al.*, No. 1:26-cv-00548-MSN-WBP (E.D. Va.), filed February 23,

2026, arising from the same seizure of Camp Oryx. KTC is not presently a plaintiff in that action.

15. KTC files this Complaint to preserve its own claims and intends promptly to move to consolidate this action with the related action under Federal Rule of Civil Procedure 42(a). KTC does not seek any recovery cumulative of a recovery obtained by Oryx or Farhan Yusefzai for the same underlying loss.

## FACTUAL BACKGROUND

### Camp Oryx and the 2018 KTC Contract

16. Camp Oryx was a logistics and lodging facility situated on the Jalalabad Road outside Kabul, Afghanistan, comprising approximately 60,112 square meters of land together with buildings, accommodation blocks, offices, a helipad, vehicle facilities, and a container laydown yard. It supported United States government contractors operating in Afghanistan.

17. The land was owned by Farhan Yusefzai, and the improvements were owned by Oryx. The facility was operated by KTC's subsidiary Oryx. The KTC group of companies derived substantial and recurring income from the facility.

18. On October 13, 2018, Constellis contracted with KTC under Contract No. GM3043 for permission to use Camp Oryx for lodging, meals, laundry, office space, and recreational services; to use its helipad; and to store containers on the grounds.

19. Constellis sought the arrangement because Afghan authorities had begun scrutinizing its storage of illegal weapons at Camp Integrity, another facility it then used.

20. The 2018 KTC Contract provides that "CONSTELLIS agrees to have all their assets, registered with afghan government, and they take full responsibility of their assets on KICY with the framework of afghan government, and KTC Group and the facility owners are

not responsible for any liabilities and government endorsements in regards to CONSTELLIS activities and assets."

21. The 2018 KTC Contract states that it is "effective upon signing by both parties," and its period of performance runs from October 13, 2018 "through the time the customer uses the facility, unless amended in writing by mutual agreement of the parties."

22. Constellis used Camp Oryx continuously from October 2018 through August 2021. No writing between Constellis and KTC ever amended or terminated the 2018 KTC Contract.

**Constellis breaches immediately, and then gives assurances it knows to be false**

23. Within hours of Constellis moving its containers onto Camp Oryx in October 2018, Afghan law enforcement arrived at the facility to search for illegal weapons. Unregistered firearms belonging to Constellis were found on the property and removed.

24. In or about November 2018, Richard Rice, Constellis's Afghanistan Country Manager, and David Marshall, Constellis's Business Development Manager, told Yusefzai—in his capacity as chief executive of both KTC and Oryx—that Constellis was no longer storing illegal or unregistered weapons at Camp Oryx and would not do so going forward.

25. Based on these representations, KTC permitted Oryx and Triple Canopy, a Constellis subsidiary, to enter a new agreement in November 2018. This agreement required Triple Canopy to "inform the facility and security managers if there are hazard[ous] equipment stored at the facility including firearms," reserved the right to investigate and remove any illegal or unregistered items, and permitted immediate termination upon discovery of a violation.

26. In or about January 2019, Constellis tendered its Code of Business Ethics and Conduct ("COBEC") to Oryx and made acceptance of it a condition of continuing to do business.

The COBEC represented that Constellis "and its affiliates . . . are committed to conducting business . . . in accordance with applicable laws and regulations of the United States and other countries and jurisdictions in which we operate"; that "Constellis personnel are prohibited from purchasing, possessing, using, or selling privately owned firearms, ammunition, or explosives in the area of operation"; that "Constellis personnel shall not possess nor use firearms or ammunition that are illegal under any applicable law"; and that "[a]ll Constellis and affiliated company personnel…who receive this Code are obligated to follow its provisions."

27. In reliance on Constellis's assurances and on the COBEC, KTC permitted Constellis's continued use of Camp Oryx, and Oryx relinquished the notice, inspection, removal, and termination rights described above in favor of Constellis's standard-form Vendor Services Agreements, executed in July 2019 and again in February 2021, which contained none of those protections.

28. Those same assurances led KTC to permit the operating relationship with Constellis to be conducted through its subsidiary. Before November 2018, Constellis contracted with KTC for the use of Camp Oryx, and Constellis's payments for that use were owed to KTC. KTC was under no obligation to change that arrangement, and it derived the revenue from Constellis's use of the facility. Believing that Constellis had corrected the weapons problem and would comply with Afghan law going forward, KTC permitted Oryx to contract with Constellis directly and permitted Constellis's payments to be made to Oryx rather than to KTC. Had KTC known that Constellis was continuing to store unregistered weapons at Camp Oryx and had no intention of complying with the obligations it was undertaking, KTC would not have permitted that change, would not have allowed the revenue from Camp Oryx to be redirected, and would have enforced the 2018 KTC Contract and required the removal of the weapons.

**Constellis's own records show it knew its assurances were false**

29. Constellis's contemporaneous business records establish that Constellis was storing unregistered weapons at Camp Oryx throughout the period in which it was assuring Oryx and KTC that it was not.

30. In April 2019, Constellis circulated internally weapons-holding spreadsheets listing rifles held at Camp Oryx that lacked Ministry of Interior registration. Legacy weapons paperwork from the same period acknowledged that Constellis was holding spare weapons that were not registered and were "illegal to hold."

31. In May 2019, a Constellis manager circulated a spreadsheet of weapons at Camp Oryx to be returned to the Afghan authorities, instructing that "[a]ll the different company weapons to be returned need to be separated and not in view when the APPF arrive to collect them."

32. In August 2019, a Constellis "Weapons Comparison List" identified weapons that were "not on list," and a "Commercial Asset Registry" with a tab titled "OG-Assets-Oryx" recorded containers at Camp Oryx while leaving the contents of many of them blank.

33. In February and March 2020, Constellis personnel circulated spreadsheets and emails identifying weapons stored in the armory container at Camp Oryx—including an MP-5 and short-barreled AK-pattern rifles—which Constellis personnel described as "illegal" and impossible to register with the Ministry of Interior, such that the only options were destruction or removal from the country.

34. Constellis personnel wrote internally that discussion of the weapons issue "needs to be top to as above and beyond any other issue" and that "[t]his one will get [our] people locked up."

35. In August 2021, after the seizure, a Constellis manager prepared a list of the containers' contents and recorded that "the list are inaccurate compared to reality."

36. Throughout this period, Constellis kept the containers locked, retained the only keys, placed them behind a secured fence monitored by Constellis's own CCTV cameras, and prohibited Afghan personnel from approaching them. KTC had no means of learning what was inside.

**Constellis's continuous access to Camp Oryx**

37. Constellis's access to Camp Oryx was not occasional. Each entry required a written visitor request form, and Constellis submitted them continuously from December 2018 through August 12, 2021, requesting access essentially every other day across the entire relationship.

38. Nine documented visits occurred between August 1 and August 12, 2021, including on August 10, August 11, and August 12, 2021. The forms record the vehicles brought onto the property, including, on August 1, 2021, three heavy-lift crane trucks admitted with six Afghan personnel, and, on August 11 and August 12, 2021, a cargo truck.

39. Constellis therefore had the means, the opportunity, and the equipment to add material to the containers throughout the period, including in the days immediately before the seizure.

**Constellis brings heavy weapons and explosives to Camp Oryx in July and August 2021**

40. The material that contributed most significantly to the seizure of Camp Oryx was of a categorically different kind from the unregistered light firearms known to be discussed in Constellis's earlier internal communications. It included a DShK 12.7mm heavy machine gun,

82mm mortars and mortar tubes, rocket-propelled grenades and launchers, landmines, and explosive munitions.

41. Under the Afghan Ministry of Interior's Procedure for Regulating Activities of Private Security Companies, a private security company may not keep, carry, transfer, or make use of heavy or medium weapons at all, and may not buy, sell, or distribute explosives. These items were not merely unregistered; they were incapable of lawful registration by Constellis under any circumstances.

42. On information and belief, none of that material was present at Camp Oryx before late July or August 2021. On information and belief, it was transported there in late July and August 2021 as Constellis closed and consolidated its remaining in-country facilities during the final phase of the withdrawal.

**The August 10–12, 2021 delegation visit**

43. On or about August 10, 11, and 12, 2021, a Constellis delegation of foreign and Afghan personnel came to Camp Oryx. Constellis's access request forms document Ian McFadyen, Aled Owen, and Firoz Safari on site with drivers and armed escorts on August 10 and August 11, 2021, and Firoz Safari with a cargo truck on August 12, 2021. During the visit, Constellis considered whether to destroy its illegal weapons and, on information and belief, used trucks to bring additional illegal weapons. However, Constellis did not attempt to destroy any weapons.

44. Destruction was in any event no longer a feasible remedy. The quantity of weapons in the containers could not have been destroyed in the time remaining; such an undertaking would have taken months. Only disclosure, removal, or an accounting to the Afghan authorities could have averted the loss, and Constellis pursued none of them.

45. As of August 15, 2021, the only containers at Camp Oryx belonging to anyone other than the operator were those of Constellis and of PAE. The PAE containers held vehicle-maintenance equipment and contained no weapons or explosives. Every remaining container held maintenance and cleaning supplies. No container other than Constellis's held explosives or heavy weapons.

**The seizure, and Constellis's refusal to take responsibility for their assets**

46. On or about August 18, 2021, Taliban forces arrived at Camp Oryx and demanded that the Constellis Containers be opened. Notice was given to Constellis within hours.

47. Constellis instructed that the locks be broken, stating that it did not know where the keys were because it had left in a rush. It gave no warning of what the containers held.

48. The Taliban broke the locks and discovered more than 5,000 weapons, together with explosives and munitions. They concluded that Camp Oryx had been a clandestine United States military facility, declared it war booty, and confiscated it.

49. The Taliban sought proof of registration for the weapons, or a representative of their owner who would account for them. Over the weeks that followed, Yusefzai repeatedly asked Constellis to produce registration documents or to send a representative to Camp Oryx to take responsibility for the weapons.

50. Constellis refused every request. It produced no registration documents, sent no representative, and offered the Afghan authorities no explanation. On or about August 25, 2021, it terminated its agreements, stating that "[t]his termination is not a reflection on your performance," and ceased communicating.

51. A Taliban court subsequently affirmed the seizure of Camp Oryx precisely because the facility was unable to "present the owner or a legal representative of Constellis" to verify its account of the weapons, as Constellis was required to do under the KTC Contract.

52. Members of Oryx's staff were detained, interrogated, and tortured. The general manager was beaten with rifles and held for approximately six days, then compelled to return for roughly seven more. Another employee was held for more than two months. One member of the staff died.

53. Camp Oryx was permanently lost, and with it the business the KTC group of companies had built there. KTC's other facilities, which held no Constellis weapons, were untouched and continued to operate profitably.

54. Constellis's agreement "to have all their assets, registered with afghan government," was violated every time Constellis brought another unregistered firearm or unregistrable heavy weapon onto Camp Oryx. Each introduction of unregistered or unregistrable weapons onto Camp Oryx was a separate wrongful act inflicting its own injury. The introduction of war-caliber heavy weapons and explosives in late July and August 2021 was a new and distinct wrong, not the continuation of any earlier one. *Cf. Forest Lakes Cmty. Ass'n v. United Land Corp. of Am.*, 293 Va. 113, 124 (2017). On information and belief, Constellis continued bringing illegal weapons to Camp Oryx with each site access request through August 12, 2021, many of which were, on information and belief, deceitfully described as for an innocuous purpose such as checking a camera.

55. Constellis's obligation to "take full responsibility of their assets" was breached on and after August 18, 2021, when Constellis refused to produce registration documents for the weapons, refused to send any representative to account for them, and refused to explain their

presence to the Afghan authorities, and again on or about August 25, 2021, when it terminated and ceased communicating. Those breaches accrued no earlier than August 18, 2021.

56. For all breaches before that, Constellis used direct and indirect means to obstruct the filing of these claims within the meaning of Va. Code § 8.01-229(D). Its conduct was not passive silence. Constellis took affirmative, repeated, and deliberate steps to prevent KTC from learning what Constellis had placed at the facility KTC had contracted to it, including the following:

a. Physical concealment. Constellis stored the weapons in shipping containers that Constellis alone locked and to which Constellis alone held the keys; positioned those containers behind a secured perimeter fence; and monitored the container area with closed-circuit cameras that Constellis itself installed and controlled.

b. Enforcement of an exclusion zone against the facility's own employees. Constellis affirmatively instructed that Oryx personnel were prohibited from entering the area where the Constellis Containers were located, and gave that instruction in at least one meeting at which Oryx personnel were present. Constellis enforced the prohibition on an ongoing basis: when employees approached the container area, Constellis notified management that personnel had entered a restricted area and directed that those individuals be turned back. No Oryx employee entered the container area at any time between October 2018 and August 2021.

c. Elimination of the contractual means of discovery. Constellis procured the surrender of the November 2018 LSA's rights to be informed of hazardous equipment including firearms, to investigate and remove illegal or unregistered items, and to terminate upon discovering a violation, and replaced them with standard-form agreements conferring no right of inspection, no right of notice, and no right of access to the containers.

d. Affirmative misrepresentations of legal compliance. In or about November 2018, immediately after Afghan law enforcement searched Camp Oryx for illegal weapons, Richard Rice and David Marshall told Yusefzai that Constellis was no longer storing illegal or unregistered weapons at Camp Oryx and would not do so going forward. In or about January 2019, Constellis tendered its Code of Business Ethics and Conduct as a condition of continued business, representing that Constellis and its affiliates conducted business in accordance with applicable law, that Constellis personnel were prohibited from possessing firearms, ammunition, or explosives in the area of operation, and that Constellis personnel would not possess firearms or ammunition illegal under any applicable law.

e. Conduct designed to convey that the 2018 problem had been resolved. In 2019, Constellis separated and removed a quantity of weapons from Camp Oryx in a manner that conveyed that any prior irregularity was being regularized with the Afghan authorities, while internally instructing that "[a]ll the different company weapons to be returned need to be separated and not in view when the APPF arrive to collect them."

f. False reasons given for access. On information and belief, Constellis gave false or incomplete reasons for visiting Camp Oryx on occasions when the actual purpose was to deliver, retrieve, or inspect weapons held in the Constellis Containers, including on August 10 and August 11, 2021, when the stated purpose of the visit was to check a camera.

g. A documented internal decision to withhold the truth. Constellis's internal communications record that the weapons issue "needs to be top to as above and beyond any other issue" because "[t]his one will get [our] people locked up"; that attempting to hand over unregistered and unassigned weapons "will be a significant issue for all concerned"; and that surrendering weapons without a formal amnesty would "risk further aggravation and likely significant penalties."

h. Concealment at the moment disclosure would have mattered most. In August 2021, Constellis's own continuity planning identified "Weapons at risk" at Camp Oryx, forecast that local nationals would "want to disassociate all connections to Constellis in fear of retribution from the Taliban," and identified leaving the weapons "at risk to facilitate a return of Constellis to Afghanistan" as an option. Constellis chose that option without telling KTC. On August 10, 11, and 12, 2021, with the containers open and Constellis personnel on site, Constellis asked a site employee to destroy "expired" weapons; when told the request required management's approval, Constellis never sought it and never disclosed the weapons to management at all. On August 18, 2021, Constellis instructed that the locks be broken without disclosing what the containers held.

i. Records known to be false. After the seizure, a Constellis manager preparing an inventory of the containers' contents recorded that "the list are inaccurate compared to reality."

57. Constellis concealed these facts deliberately and for its own benefit. Disclosure risked a claim for breach and a report of the matter to the Ministry of Interior. Disclosure to the Afghan authorities risked fines, frozen accounts, revocation of Constellis's operating license, criminal exposure for its personnel, and the cost of repurchasing weapons it hoped to reclaim if it returned to Afghanistan. Constellis resolved that calculus against KTC on every occasion it presented itself, from 2018 through August 2021.

58. Constellis's obstruction began no later than November 2018 and continued until August 18, 2021, when Taliban forces broke the locks and opened the Constellis Containers. That period is excluded from the computation of any limitations period applicable to KTC's contract claims. Va. Code § 8.01-229(D).

59. On August 18, 2021, KTC learned that Constellis had stored weapons at Camp Oryx and had not disclosed them. At the time, this looked like a mere breach of contract and KTC did not then learn that Constellis's representations were false *when* made.

60. In 2025, Constellis produced internal weapons registers, asset spreadsheets, and correspondence in document discovery in *Oryx Afghanistan, Limited v. Constellis, LLC*, No. CL-2023-5767 (Va. Cir. Ct. Fairfax Cnty.). Those documents show that at the same time Constellis was tendering its Code of Business Ethics and Conduct for signature and executing agreements incorporating that Code, the ANSI/ASIS PSC.1 standard, and the Ministry of Interior Procedures, Constellis was storing unregistered weapons at Camp Oryx in violation of each of those instruments, knew it, and had no intention of abiding by the representations it was making. KTC's claims sounding in fraud did not accrue, and could not through reasonable diligence have been discovered, before that 2025 date. Va. Code § 8.01-249(1).

61. From August 18, 2021 and for weeks afterward, Yusefzai demanded that Constellis produce registration documentation for the weapons and send a representative to account for them. Constellis produced nothing, sent no one, terminated the agreements on or about August 25, 2021, and ceased communicating. KTC pursued the facts with reasonable diligence from the moment any of them became available, and was met with silence until the 2025 production.

**Alternative allegations concerning the purported novation**

62. KTC denies that the November 2018 LSA or the 2019 or 2021 Vendor Services Agreements amended, terminated, discharged, or superseded the 2018 KTC Contract. KTC was not a signatory to those agreements, and none of them constitutes a writing between KTC and Constellis amending or terminating their contract.

63. A novation discharging the 2018 KTC Contract could have occurred only with KTC's assent. KTC's assent was necessary because KTC, not Oryx, was the existing counterparty whose contractual rights would be extinguished by the substitution of Oryx as the operating counterparty.

64. Although KTC denies that any valid novation occurred, any purported assent by KTC to such a novation occurred through a transaction separate from the Oryx agreements themselves. Acting through Yusefzai in his capacity as KTC's chief executive, KTC authorized Oryx to enter the replacement operating agreements, permitted Constellis's continued use of Camp Oryx under that restructured arrangement, and refrained from enforcing KTC's rights under the 2018 KTC Contract. Constellis knew that KTC's authorization and forbearance were necessary to any substitution of Oryx for KTC.

65. Constellis procured KTC's authorization, consent, and forbearance through the misrepresentations and concealment alleged above. In particular, Constellis represented to Yusefzai, acting for KTC, that Constellis was no longer storing illegal or unregistered weapons at Camp Oryx and would not do so going forward. Constellis made those representations intending that KTC permit the restructuring and relinquish or refrain from enforcing its existing contractual protections.

66. KTC relied on those representations in authorizing the restructuring and permitting Oryx to enter the later agreements. Had KTC known the truth, it would not have

authorized the substitution, would not have consented to any discharge of the 2018 KTC Contract, and would have required Constellis to remove its weapons and assets from Camp Oryx.

67. KTC does not seek in this action to rescind or invalidate the November 2018 LSA or the 2019 or 2021 Vendor Services Agreements as between their respective signatories. Those agreements may stand. KTC seeks only a determination that they did not discharge Constellis's separate obligations to KTC or, in the alternative, that KTC's fraudulently induced assent to any such discharge is rescinded.

68. Without valid assent by KTC to the discharge of its rights, no novation occurred, and the 2018 KTC Contract remained enforceable throughout Constellis's use of Camp Oryx.

**COUNT I – Declaratory Judgment – No Novation of the 2018 KTC Contract (Against Constellis)**

69. KTC incorporates by reference and realleges each of the foregoing paragraphs as if fully set forth herein.

70. An actual and justiciable controversy exists between KTC and Constellis concerning whether Constellis's obligations to KTC under the 2018 KTC Contract were discharged when Oryx contracted with Constellis directly. Constellis contends or is expected to contend that they were. KTC contends that they were not.

71. Constellis's obligations to KTC could have been discharged only by a novation: the substitution of a new obligation or a new party for the old, with the assent of all parties and a clear intent to extinguish Constellis's undertakings to KTC. Novation is never presumed, and the party asserting it bears the burden of proving it.

72. No novation occurred. KTC was not a party to the November 2018 LSA or to the 2019 or 2021 Vendor Services Agreements. No writing between KTC and Constellis discharged

the 2018 KTC Contract. KTC never agreed to release Constellis from its undertakings to KTC, and never intended that its rights under the 2018 KTC Contract be extinguished.

73. The 2018 KTC Contract by its terms ran from October 13, 2018 "through the time the customer uses the facility, unless amended in writing by mutual agreement of the parties." Constellis used the facility without interruption through August 2021, and no such written amendment was ever made.

74. KTC is entitled to a declaration that the 2018 KTC Contract was not discharged, was not superseded, and remained in force and enforceable against Constellis throughout its use of Camp Oryx and through August 2021.

**COUNT II – Rescission of KTC's Assent to Any Purported Novation**

**(Pleaded in the Alternative) (Against Constellis)**

75. KTC incorporates by reference and realleges each of the foregoing paragraphs as if fully set forth herein. This Count is pleaded in the alternative to Count I, and applies only if the Court determines that KTC assented to a novation discharging the 2018 KTC Contract.

76. Any such assent was given through KTC's authorization of the restructuring, its permission for Constellis's continued use of Camp Oryx under the replacement arrangement, and its forbearance from enforcing the 2018 KTC Contract. That authorization, consent, and forbearance were procured by Constellis's misrepresentations and concealment alleged above.

77. A transaction procured by fraud is voidable at the election of the injured party. KTC elects to rescind and disaffirm its assent to the purported novation and to the resulting discharge of the 2018 KTC Contract. KTC does not thereby seek to rescind or invalidate any agreement between Constellis and Oryx.

78. KTC seeks rescission of that assent, restoration of the parties to their positions before the purported novation, and a declaration that the 2018 KTC Contract was never discharged and remained in force through August 2021.

**COUNT III – Breach of Contract – Failure to Take Responsibility for Its Assets (2018 KTC Contract) (Against Constellis)**

79. KTC incorporates by reference and realleges each of the foregoing paragraphs as if fully set forth herein. Every count of this Complaint is pleaded in the alternative to every other count pursuant to Federal Rule of Civil Procedure 8(d)(2)–(3), and no count is dependent upon any other.

80. This Count is conditioned on a determination under Count I that no novation occurred, or on rescission under Count II of KTC's assent to any purported novation. In either event the 2018 KTC Contract remained in force and enforceable against Constellis through August 2021.

81. The 2018 KTC Contract is a valid and enforceable contract between KTC and Constellis. It operated at the parent-to-parent level, while the November 2018 LSA was an agreement between their respective subsidiaries, Oryx and Triple Canopy. Through the later VSAs, Oryx entered into task order agreements with multiple Constellis entities, governed by the VSAs between Constellis and Oryx. While this arrangement shifted the recipient of payments for use of Camp Oryx, it was not an agreement between KTC and Constellis and did not extinguish Constellis's obligations to KTC during its use of the facility.

82. The agreement remained in force through August 2021. By its terms it ran "through the time the customer uses the facility," Constellis used the facility without interruption through August 2021, and no writing between Constellis and KTC ever amended or terminated

it. KTC was not a signatory to the 2019 or 2021 Vendor Services Agreements and never agreed to be bound by their integration provisions.

83. Under the KTC agreement, Constellis undertook to "take full responsibility of their assets" at the facility "with the framework of afghan government," and agreed that "KTC Group and the facility owners are not responsible for any liabilities and government endorsements in regards to CONSTELLIS activities and assets."

84. Constellis breached this covenant on and after August 18, 2021. When the Afghan authorities demanded an accounting for the weapons Constellis had placed at Camp Oryx, Constellis refused to produce registration documents, refused to send any representative to take responsibility for the weapons, refused to explain their presence, and on or about August 25, 2021 terminated its agreements and ceased communicating. It thereby left KTC and the facility owner to bear precisely the liabilities and government consequences the agreement placed on Constellis.

85. These breaches accrued no earlier than August 18, 2021 and are timely under the five-year limitations period of Va. Code § 8.01-246(2).

86. Constellis's refusal was the proximate cause of the permanent loss of Camp Oryx. The Taliban court affirmed the seizure because the facility could not "present the owner or a legal representative of Constellis." Had Constellis produced authority for the weapons or sent a representative, Camp Oryx would not have been seized.

87. As a direct and proximate result of this breach, KTC was deprived of the benefit of its bargain and of the business conducted from Camp Oryx, which was permanently lost. KTC was damaged in an amount to be proven at trial but believed to be no less than $19,500,000, representing (i) the present value of lost future profits of at least $1,000,000 annually and

continuing indefinitely, believed to be at least $15,000,000, and (ii) past lost profits of at least $4,500,000 since August 18, 2021. KTC does not seek the value of the land at Camp Oryx, which was owned by Farhan Yusefzai, or the value of the buildings and improvements, which were owned by Oryx Afghanistan. This recovery is pleaded in the alternative to, and is not cumulative of, any recovery obtained by Oryx Afghanistan for the same income stream.

88. The income stream KTC lost was generated by the operation of Camp Oryx as a commercial logistics and lodging facility serving United States government contractors generally, of which Constellis was one customer among others. Constellis's conduct caused the confiscation of the facility itself, destroying the source of that income entirely and permanently, and with it the business the KTC group of companies had built there. The damages KTC seeks are the value of that destroyed enterprise. KTC's other facilities, which held no Constellis weapons, were inspected by the Taliban, were not seized, and continue to operate profitably.

**COUNT IV – Breach of Contract – Failure to Register Assets (2018 KTC Contract)**
**(Against Constellis)**

89. KTC incorporates by reference and realleges each of the foregoing paragraphs as if fully set forth herein. Every count of this Complaint is pleaded in the alternative to every other count pursuant to Federal Rule of Civil Procedure 8(d)(2)–(3), and no count is dependent upon any other.

90. This Count is conditioned on a determination under Count I that no novation occurred, or on rescission under Count II of KTC's assent to any purported novation. In either event the 2018 KTC Contract remained in force and enforceable against Constellis through August 2021.

91. Under the 2018 KTC Contract, Constellis agreed "to have all their assets, registered with afghan government." That covenant applied to Constellis's weapons as it applied to its other assets.

92. On information and belief, in late July and August 2021 Constellis transported and caused to be transported to Camp Oryx, for the first time, heavy weapons, explosive munitions, and launchers, without registering them with the Afghan government. Those items were incapable of registration by a private security company under Afghan law, and Constellis brought them onto KTC's facility regardless.

93. Each such introduction was a new and independent breach of the registration covenant, accruing on the date it occurred.

94. Constellis employees were physically present at Camp Oryx on or around August 10–12, 2021, with the containers open and with actual knowledge of their contents, and took no step to register the weapons, to remove them, or to report them to the Afghan authorities. That failure was itself a breach of the registration covenant occurring on those dates.

95. As a direct and proximate result of this breach, KTC was deprived of the benefit of its bargain and of the business conducted from Camp Oryx, which was permanently lost. KTC was damaged in an amount to be proven at trial but believed to be no less than $19,500,000, representing (i) the present value of lost future profits of at least $1,000,000 annually and continuing indefinitely, believed to be at least $15,000,000, and (ii) past lost profits of at least $4,500,000 since August 18, 2021. KTC does not seek the value of the land at Camp Oryx, which was owned by Farhan Yusefzai, or the value of the buildings and improvements, which were owned by Oryx Afghanistan. This recovery is pleaded in the alternative to, and is not cumulative of, any recovery obtained by Oryx Afghanistan for the same income stream.

96. The income stream KTC lost was generated by the operation of Camp Oryx as a commercial logistics and lodging facility serving United States government contractors generally, of which Constellis was one customer among others. Constellis's conduct caused the confiscation of the facility itself, destroying the source of that income entirely and permanently, and with it the business the KTC group of companies had built there. The damages KTC seeks are the value of that destroyed enterprise. KTC's other facilities, which held no Constellis weapons, were inspected by the Taliban, were not seized, and continue to operate profitably.

**COUNT V – Breach of Contract – Earlier Breaches of the 2018 KTC Contract (Pleaded in the Alternative) (Against Constellis)**

97. KTC incorporates by reference and realleges each of the foregoing paragraphs as if fully set forth herein. Every count of this Complaint is pleaded in the alternative to every other count pursuant to Federal Rule of Civil Procedure 8(d)(2)–(3), and no count is dependent upon any other.

98. This Count is conditioned on a determination under Count I that no novation occurred, or on rescission under Count II of KTC's assent to any purported novation. In either event the 2018 KTC Contract remained in force and enforceable against Constellis through August 2021.

99. In the alternative, and to the extent the heavy weapons and explosives discovered in August 2021 were present at Camp Oryx before late July 2021, Constellis breached the registration and responsibility covenants of the 2018 KTC Contract on each occasion on which it brought unregistered weapons onto Camp Oryx or failed to register weapons already there.

100. Constellis's own records establish that unregistered weapons were held at Camp Oryx from 2018 onward and that Constellis knew they were unregistered and, in some instances, incapable of registration.

101. KTC did not discover, and in the exercise of reasonable diligence could not have discovered, those breaches until 2025. Constellis obstructed the filing of any action upon them within the meaning of Va. Code § 8.01-229(D) by the means alleged above, and the period of that obstruction is excluded from the limitations computation.

102. As a direct and proximate result of this breach, KTC was deprived of the benefit of its bargain and of the business conducted from Camp Oryx, which was permanently lost. KTC was damaged in an amount to be proven at trial but believed to be no less than $19,500,000, representing (i) the present value of lost future profits of at least $1,000,000 annually and continuing indefinitely, believed to be at least $15,000,000, and (ii) past lost profits of at least $4,500,000 since August 18, 2021. KTC does not seek the value of the land at Camp Oryx, which was owned by Farhan Yusefzai, or the value of the buildings and improvements, which were owned by Oryx Afghanistan. This recovery is pleaded in the alternative to, and is not cumulative of, any recovery obtained by Oryx Afghanistan for the same income stream.

103. The income stream KTC lost was generated by the operation of Camp Oryx as a commercial logistics and lodging facility serving United States government contractors generally, of which Constellis was one customer among others. Constellis's conduct caused the confiscation of the facility itself, destroying the source of that income entirely and permanently, and with it the business the KTC group of companies had built there. The damages KTC seeks are the value of that destroyed enterprise. KTC's other facilities, which held no Constellis weapons, were inspected by the Taliban, were not seized, and continue to operate profitably.

**COUNT VI – Fraud in the Inducement (Pleaded as a Further Alternative)**
**(Against Constellis)**

104. KTC incorporates by reference and realleges each of the foregoing paragraphs as if fully set forth herein. This Count is pleaded as a further alternative, and applies only if the

Court determines both that a novation discharged the 2018 KTC Contract and that KTC's assent to that novation is not rescinded. In that event KTC affirms the transaction and seeks damages for the fraud that procured it. KTC does not seek both rescission under Count II and damages under this Count for the same transaction.

105. Constellis defrauded KTC in two ways at once. It made affirmative representations about its weapons practices that were false when made, and it concealed the truth those representations were designed to obscure. Under Virginia law each is actionable as fraud, and concealment, whether accomplished by word or by conduct, is the equivalent of a false representation, because concealment always involves deliberate nondisclosure designed to prevent another from learning the truth. Van Deusen v. Snead, 247 Va. 324, 328 (1994); Allen Realty Corp. v. Holbert, 227 Va. 441, 450 (1984).

106. In or about November 2018, immediately after Afghan law enforcement searched Camp Oryx for illegal weapons, Richard Rice, Constellis's Afghanistan Country Manager, and David Marshall, its Business Development Manager, told Yusefzai that Constellis was no longer storing illegal or unregistered weapons at Camp Oryx and would not do so going forward. In or about January 2019, Constellis tendered its Code of Business Ethics and Conduct as a condition of continued business, representing that Constellis and its affiliates conducted business in accordance with applicable law, that its personnel were prohibited from possessing firearms, ammunition, or explosives in the area of operation, and that its personnel would not possess firearms or ammunition illegal under any applicable law. In February 2021, Constellis tendered agreements incorporating that Code, the ANSI/ASIS PSC.1 standard, and the Afghan Ministry of Interior Procedures, thereby representing that its own use of Camp Oryx conformed to each.

Each of those representations was a representation of then-existing fact, and each was false when made.

107. Constellis simultaneously concealed the facts that would have exposed those representations as false. It concealed that it was then storing unregistered weapons at Camp Oryx, that a substantial portion of the material it held was incapable of registration by any private security company under Afghan law, and that its own personnel had said so in writing. It locked the containers and kept the only keys; placed them behind a secured fence monitored by its own cameras; barred Afghan personnel from approaching them; procured the elimination of the contractual right of inspection; and never disclosed the weapons at any time before August 2021. When a site employee was asked in August 2021 to destroy "expired" weapons, Constellis did not disclose the character or unlawfulness of what the containers held.

108. Constellis was obliged to disclose these facts to KTC, and that duty did not arise from any contract. It arose because (a) Constellis had exclusive knowledge of a concealed and abnormally dangerous condition on land it occupied by license, a duty the occupier of land owes the owner independently of any agreement; (b) having spoken to the subject of its weapons practices in November 2018 and again in its Code of Business Ethics and Conduct, Constellis was bound to speak fully and truthfully rather than in a manner made misleading by omission; and (c) Constellis knew KTC was acting on the assumption that no such condition existed and that KTC had no means of discovering it. More fundamentally, the duty Constellis breached is the common law duty not to procure another's assent to an agreement by fraud, which arose before and independently of the agreements Constellis thereby obtained. Cf. Abi-Najm v. Concord Condominium, LLC, 280 Va. 350, 361 (2010).

109. Constellis knew its representations were false and made its nondisclosure knowingly and deliberately, not negligently or recklessly. Its contemporaneous internal communications, weapons registers, and asset spreadsheets record that it was then storing unregistered weapons at Camp Oryx, that its personnel regarded certain of them as illegal and impossible to register with the Ministry of Interior, and that surrendering them would expose Constellis to significant penalties. Those same records show Constellis weighing disclosure against fines, license revocation, and the prospect that its personnel would be "locked up," and resolving that calculus against disclosure on every occasion it arose.

110. Constellis made these representations, and withheld the truth, intending that KTC rely on them—that KTC continue to make Camp Oryx available for Constellis's storage and relinquish the registration and responsibility covenant of the 2018 KTC Contract and the notice, inspection, removal, and termination rights that succeeded it.

111. Constellis further intended that KTC rely on its assurances in permitting the contracting relationship, and the revenue stream it generated, to be moved from KTC to Oryx, leaving KTC without the contractual protections it had held and without the payments it had received.

112. The representations and the facts concealed were material. The prohibition on illegal and unregistered weapons was central to the parties' arrangement from the outset; KTC's licenses, its facility, its business, and the physical safety of its personnel all depended on it.

113. KTC relied on Constellis's representations and on the assumption that no illegal or unregistered weapons were present, and that reliance was reasonable. Yusefzai received the representations as principal of KTC and acted on them in that capacity. Constellis was an authorized United States government contractor subject to detailed regulatory obligations

concerning compliance with host-nation law, and it held itself out as bound by them. After 2019 KTC had no right of inspection, no key, and no independent means of learning what was in the containers, and Constellis knew its assurances would have to be taken on trust. KTC could not have discovered the truth through the exercise of ordinary diligence.

114. Had KTC known the truth, it would not have permitted Constellis's continued use of Camp Oryx, would not have relinquished the protections it held, and would have enforced its rights under the 2018 KTC Contract and required the removal of the weapons.

115. KTC did not discover the fraud until 2025, when Constellis produced the documents establishing it. Va. Code § 8.01-249(1). Constellis's concealment independently tolled any applicable limitations period. Va. Code § 8.01-229(D).

116. As a direct and proximate result, KTC lost the protections that would have prevented the loss of Camp Oryx, lost the arrangement under which Constellis's use of Camp Oryx was to be conducted, and lost the income stream that arrangement generated. KTC does not seek the profits it expected to earn from Constellis under any particular agreement. The income stream KTC lost was generated by the operation of Camp Oryx as a commercial logistics and lodging facility serving contractors generally, of which Constellis was one customer among others. Constellis's conduct caused the confiscation of the facility itself, destroying the source of that income entirely and permanently, and with it the business the KTC group of companies had built there. The damages KTC seeks are the value of that destroyed enterprise, not the benefit of any bargain with Constellis. KTC was damaged in an amount to be proven at trial but believed to be no less than $19,500,000, representing (i) the present value of lost future profits of at least $1,000,000 annually and continuing indefinitely, believed to be at least $15,000,000, and (ii) past lost profits of at least $4,500,000 since August 18, 2021. KTC does not seek the value of the land

at Camp Oryx, which was owned by Farhan Yusefzai, or the value of the buildings and improvements, which were owned by Oryx Afghanistan. This recovery is pleaded in the alternative to, and is not cumulative of, any recovery obtained by Oryx Afghanistan for the same income stream.

117. Constellis's conduct was willful, wanton, and in conscious disregard of KTC's rights and of the safety of its personnel, warranting punitive damages in the maximum amount permitted by Va. Code § 8.01-38.1.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Khidmat Trident Company respectfully requests that this Court:

1. On Count I, declare that the 2018 KTC Contract was not discharged or superseded and remained in force and enforceable against Constellis through August 2021;

2. In the alternative, on Count II, rescind KTC's assent to any purported novation and declare that the 2018 KTC Contract was never discharged;

3. On Counts III through V, enter judgment in favor of KTC and against Constellis and award KTC compensatory damages in an amount to be proven at trial but believed to be no less than $19,500,000, representing the present value of lost future profits of at least $15,000,000 and past lost profits of at least $4,500,000 since August 18, 2021, pleaded in the alternative to and not cumulative of any recovery obtained by Oryx Afghanistan for the same income stream;

4. In the further alternative, on Count VI, enter judgment in favor of KTC and against Constellis and award KTC damages in the same amount, together with punitive damages in the maximum amount permitted by Va. Code § 8.01-38.1;

5. Award KTC prejudgment interest from August 18, 2021 and post-judgment interest, at the rates allowed by law; and

6. Grant such other and further relief as the Court deems just and proper.

**DEMAND FOR A JURY TRIAL**

Plaintiff requests a trial by jury on any and all issues so triable.

Respectfully submitted,

Dated: August 10, 2026

By: /s/ Timothy R. Clinton

**CLINTON & PEED**
Timothy R. Clinton (Va. Bar No. 70902)
Matthew J. Peed (*admitted pro hac vice*)
Rebecca A. Carter (*admitted pro hac vice*)
1775 H. St. NW, Suite 360
Washington, DC 20006
(202) 919-9491
tim@clintonpeed.com
matt@clintonpeed.com
rebecca@clintonpeed.com

*Counsel for Plaintiff*